UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 24 CR 165-1 |
| v. ) | |
| ) | Judge LaShonda A. Hunt |
| FLORIN NICOLAE TARTA ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

In the summer of 2023 through the spring of 2024, defendant stole money from Bank of America ATMs in the vicinity of Chicago and in New Jersey using counterfeit ATM cards that he and his co-defendants created utilizing device-making equipment that they installed on numerous Bank of America ATMs. Seeking to escape responsibility for the crimes he committed, defendant went to trial and committed perjury during his testimony. To adequately protect the public, punish the defendant, and deter the defendant and others from committing similarly egregious criminal conduct, the Court should impose an 81-month sentence of imprisonment, a term at the low-end of the advisory USSG range.

**I.    Criminal conduct charged in the indictment**

Between in or around August 2023, and on or about March 29, 2024, defendant and his co-schemers, including co-defendants Farcas and Smetanca, used card skimmers that they installed on ATMs to obtain the debit card numbers and PINs of ATM users. Card skimmers consisted of two components. One was a very thin metallic plate on which a card reader, memory chip, and battery had been affixed ("card reader"). The card reader was designed to be inserted with a specialized tool

into the mouth of an ATM's card acceptance slot so that it would not be visible to users of the ATM to capture financial account information from the ATM users' cards. The second component of the card skimmer was a pinhole camera with a memory chip and battery that recorded ATM users inputting their PINs ("camera"). The pinhole camera, memory chip, and battery were in an encasement designed to be unobtrusively affixed near the ATM's keypad. PSR, ¶ 11.

Several days after they were installed, defendant and his co-defendants removed the card skimmers from the ATMs, and a computer was then used to retrieve the debit card numbers and PINs that had been recorded by the device. The defendants used a computer to encode the captured debit card numbers on the magnetic strips on the back of gift cards, and the PINs associated with the debit cards were written on a sticker attached to the back of each gift card. Ex. A (seized counterfeit ATM card), Ex. B (snapshots of defendants at ATMs using gift cards). Defendant and his co-schemers used the counterfeit ATM cards and captured PINs to withdraw cash from accounts belonging to other individuals at financial institutions, such as Bank of America. Defendant and his co-defendants did so without the authority of the individual accountholders or the affected financial institutions. PSR, ¶¶ 12-13.

Defendant's involvement in the offense began in the summer of 2023, when he agreed to work jointly with co-defendants Farcas and Smetanca using skimming devices to capture debit card numbers and PINs, and then to use the stolen financial information obtained from the card skimming device – namely the ATM users' stolen

debit card account numbers and account PINs – to obtain cash fraudulently from ATM machines. While working together, Tarta and Farcas – with Farcas acting as a lookout – installed skimming devices on ATMs, while Smetanca and Farcas – with Farcas acting as a look-out – removed skimming devices after they had been installed. PSR, ¶16; Farcas plea agreement. Dkt. 92, pp. 4-5. Defendant Farcas generally created the counterfeit ATM cards for the crew. *Id.* at 5.

For example, on or about August 18, 2023, co-defendants Tarta and Farcas installed a card skimmer on an ATM owned and operated by Bank of America located on North State Street in Chicago, Illinois. Gov. Trial Ex. 5.[1] The card skimmer remained on the ATM for several days, capturing the financial account information and PINs of more than two dozen victims who were users of Bank of America's ATM. After removing the card skimmer, defendant and his co-schemers, including co-defendants Farcas and Smetanca, used the victims' stolen identification information – namely, the stolen debit card numbers and PINs – to steal cash from Bank of America ATMs using counterfeit ATM cards. PSR, ¶ 17.

Defendant and his co-schemers frequented the same ATMs and shared stolen financial account information with one another, enabling more than one co-schemer to fraudulently obtain funds from the same victim accounts. Proceeds fraudulently obtained from the ATMs through use of the stolen data were shared equally among defendant, Smetanca, and Farcas. PSR, ¶ 19.

---

[1] Gov. Trial Ex. 5 was a video file admitted at defendant's trial which depicted defendant and co-defendant Farcas installing a card skimmer on a Bank of America ATM located at 1167 N. State Street, Chicago, Illinois, on August 18, 2023.

3

In approximately mid-September 2023, defendant and Farcas split from Smetanca but continued to obtain funds fraudulently from Bank of America ATMs together in the vicinity of Chicago in the manner described above. In late November 2023, Tarta and Farcas relocated to New York City, and continued to engage in card skimming and stealing cash from Bank of America ATMs using counterfeit ATM cards in New Jersey. As they had in the past, defendant and Tarta generally worked together while doing so and equally split the proceeds they obtained. PSR, ¶¶ 20-22.

On or about March 26, 2024, defendant and Farcas installed a card skimmer on a Bank of America ATM located at a branch in Westfield, New Jersey. Gov. Trial Ex. 7A.; PSR ¶ 23. Bank of America surveillance cameras again captured defendant installing the skimming device while Farcas acted as a lookout. The card skimmer remained on the ATM until March 29, 2024, where it captured the financial account information and PINs of users of the ATM. PSR ¶ 23. Between approximately late November 2023 and March 29, 2024, defendant and Farcas also installed card skimmers on ATMs in Montclair, New Jersey, and in Red Bank, New Jersey. As they had previously done in Chicago, defendant and Farcas used financial account information – i.e., debit card numbers and PINs – stolen from users of the ATMs to create counterfeit ATM cards which they used to steal cash from Bank of America ATMs. *Id.*

The defendants' scheme was halted by law enforcement on March 29, 2024, in Westfield, New Jersey, at a drive-up ATM – the same ATM on which they had installed a card skimmer on March 26. Late in the day on March 29, Westfield PD

4

detectives investigating card skimming activity examined a Bank of America ATM and located the camera component of the defendants' card skimming device, which had been hidden between the ATM and its frame above the keypad. Ex. C (photograph depicting location from which camera was extracted by Westfield PD detective).

After locating the camera, a technician was summoned by Bank of America to the drive-up ATM vestibule, who examined the machine and extracted the defendant's card reader from its interior. Ex. D. A latent fingerprint lifted from the card reader was later reviewed by a fingerprint examiner, who identified the fingerprint as Tarta's. PSR, ¶ 24.

The Westfield PD detectives thereafter conducted surveillance at the ATM for several hours. Late in the evening on March 29th, defendant approached the ATM on foot. As Westfield Detective Eric Carrero testified at trial, defendant did not conduct a transaction at the ATM but was observed touching the area of the frame of the ATM where the camera had been located. The detectives approached the defendant and told him he was under arrest. Defendant did not submit to their authority, forcibly resisting the detectives' efforts to handcuff him. PSR, ¶ 24; GVO, Ex. F (police report detailing arrest of defendant). During their struggle with defendant, a large sum of $100 bills were recovered. *Id*. After his arrest, the Westfield PD inventoried cash seized from defendant totaling approximately $5,099, which included fifty $100 bills. PSR, ¶ 25.

At the time of his arrest, defendant was wearing clothes matching those he wore when he and Farcas installed the card skimmer on March 26th. Ex. E.

5

Defendant was also captured on Bank of America ATM surveillance cameras wearing those same clothes while stealing funds from Bank of America ATMs in Cliffwood and Aberdeen, New Jersey earlier in the evening on March 29th using counterfeit ATM cards. *Id.*

*Loss Amount*

When calculating the loss amount for Counts 1-7, because defendant participated in jointly undertaken criminal activity with co-defendants Farcas and (for a period of time) Smetanca, defendant is accountable for all criminal acts that were within the scope of their jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable in connection with that criminal activity. USSG 1B1.3(a)(1)(B). In making that calculation, the court must determine "(1) whether the acts resulting in the loss were in furtherance of jointly undertaken criminal activity; and (2) whether those acts were reasonably foreseeable to the defendant." *United States v. Sykes*, 774 F.3d 1145, 1150 (7th Cir. 2014).

The evidence shows that defendant agreed to jointly participate in card skimming and stealing funds from Bank of America ATMs with Smetanca and Farcas between approximately the summer of 2023 and mid-September 2023, until the point when Tarta and Farcas split from Smetanca in Chicago. The evidence further shows that defendant and Farcas agreed jointly to participate in the same criminal activity as a pair from the time that they split from Smetanca until their arrest in Westfield, New Jersey on March 29, 2024. These facts were established through the admissions contained in the plea agreements of Farcas and Smetanca, and through the evidence

6

admitted during defendant's trial, which included the testimony of Farcas. Farcas stated that he, defendant, and Smetanca worked together while card skimming, that they shared the proceeds from their card skimming activities equally, and that they shared expenses. Farcas also testified that once he and defendant split from Smetanca, he and defendant continued to work together with the same financial arrangement. In addition, surveillance camera footage captured Tarta and Farcas installing two skimming devices, one in New Jersey, and one in Chicago.

That testimony and evidence, when combined with surveillance camera photographs which captured defendant, Farcas, and Smetanca conducting transactions together and/or using the same stolen debit card numbers and PINs at the same locations establish by well more than a preponderance of the evidence that defendant should be held accountable for all card skimming conducted by Farcas during his participation in the scheme (between approximately August 18, 2023 and March 29, 2024), as well as for all card skimming conduct by Smetanca between approximately August 20, 2023 and on or about September 5, 2023, which is before he and Farcas split from Smetanca. Examples of such surveillance camera evidence, paired with transactional records in some instances, demonstrating the scope of the jointly undertaken criminal activity summarized below, were provided in the Government's Version of the Offense. GVO, Exhibits 7-19, 21.[2]

A spreadsheet compiling the unauthorized transactions conducted by defendant and/or Farcas between August 18, 2023, and March 29, 2024, and also

---

[2] The GVO and exhibits were all attached to the PSR.

including unauthorized transactions conducted by Smetanca between August 20, 2023, and September 5, 2023, while Smetanca was working jointly with defendant and Farcas in the card skimming operation is attached. Ex. F. Losses from those unauthorized transactions total $177,280. PSR, ¶¶ 27-29, 38.

## II. Additional criminal conduct

### A. Perjurious trial testimony

Defendant testified at trial in his defense. During his testimony, defendant willfully and falsely denied his guilt. Defendant's intentional, fantastical falsehoods were contradicted by an abundance of credible evidence that led the jury to convict him of every count in the indictment. For example, although he was captured on surveillance camera installing a card skimming device with Farcas on an ATM in Chicago on August 18, 2023, defendant falsely told the jury he did not realize that Farcas might be engaged in illegal activity until March 26, 2024, when he and Farcas installed a nearly identical card skimmer on a Bank of America ATM in Westfield, New Jersey. April 16, 2025 Trial Transcript ("Trial Trans.") at 14.[3]

Later, during his cross-examination, the video, (Gov. Trial Ex. 7A) which captured defendant installing a camera and card reader with co-defendant Farcas on

---

[3] "Eventually, I did find out what type of business he was engaging into. Then I noticed this, that he has a lot of money and so forth. And then he came to me and -- to help his video camera install. Yes, this can -- this can be seen on the video. I did install that. My luck was that this was taken away by the police officer. He lied to me when he told me that this is not considered criminal conduct if you were to install a video camera in a public place, and this is true. This is not an infringement of law. And then he asked me to place this on that ATM. I did not know what it was all about. I thought that -- my luck was that that metallic strip didn't record anything. My luck was that this was confiscated by the police force. I never saw what, in fact -- the items he had in his own house. I never knew what would be the first purpose of utilization of those items myself."

an ATM on March 26, 2024, in Westfield, New Jersey, was played for the jury. When asked whether the camera he installed was recording ATM users inputting their PINs, defendant replied, "I was in fact recording myself. I wanted to record my private life. And I started there at that ATM. What is the problem?" When asked if his testimony under oath to the jury was that he installed the camera at the ATM to record himself, defendant replied, "Yes." Trial Trans. at 24.

During his cross examination, the video that captured defendant installing a camera and card reader on an ATM in Chicago on August 18, 2023 (Gov. Trial Ex. 5) while co-defendant Farcas acted as a look-out was played for the jury. Defendant lied to the jury when asked to explain his actions on that recording. For example, when asked if the video at or about time stamp 7:07:37 depicted him using a "key" to install a card reader in the ATM, defendant replied that it did not. Trial Trans. at 27. Instead, defendant stated that his own card was stuck in the ATM and he was using the "metallic strip" to retrieve it. *Id*. When asked if the video at time stamp 7:07:54 depicted defendant installing a camera on the ATM, defendant stated it did not. Trial Trans. at 30. Defendant stated that in fact he was "testing a plastic item" so that he could "install diamond sales advertising" at the ATM. *Id*. Defendant repeated the lie about the plastic item in the next page of the transcript. Trial Trans. at 31 (describing the camera as "[t]hat plastic item that has advertising about selling diamonds and other merchandise."). In addition to being inconsistent with the video and commonsense, defendant's testimony was directly contradicted by the testimony of co-defendant Farcas. Farcas testified that both videos depicted him working with

9

Tarta to install card skimming devices on the Bank of America ATMs in order to steal PINs and account numbers from ATM users.

During his direct testimony, defendant repeatedly made broad statements to the jury in which he willfully and falsely denied his guilt, including:

> Now, as you can see, it is my word against his [Farcas's] word. That's how it is. As you can see, I never committed a theft or I never stole from any ATM machine. I never did that. I do not know what happened when those transactions took place where I was in front of those ATMs because I never took any money myself. I never did.

Trial Trans. at 15.

> We [defendant and Farcas] just ran into each other. We used to know each other, and then I have this job as a taxi or cab driver. I ended up in this position in this place without even realizing. I have nothing to do with any of this. I never got any funds out of it. I didn't.

*Id*. Defendant's testimony in this regard was also willfully false. It was contradicted by the testimony of the FBI Special Agents and the police officer who investigated his crimes, by the testimony of co-defendant Farcas, and by the abundance of evidence admitted at trial demonstrating, as charged in the indictment, that he (i) possessed and used device-making equipment to steal financial account numbers and PINs from users of Bank of America ATMs, and (ii) used that stolen personal identifying information to create counterfeit ATM cards, and (iii) utilized the counterfeit cards to steal cash from Bank of America ATMs on dozens and dozens of occasions.

### B. Use of false identity and resisting arrest in Arizona

On March 12, 2019, in Yavapai County, Arizona Superior Court, defendant was convicted of criminal impersonation, a felony, in violation of Arizona Revised

10

Statutes § 13-2006(A)(1). PSR, ¶ 62. He was also convicted of vehicular endangerment. *Id*. According to the police report associated with the arrest, callers reported to law enforcement that the vehicle defendant was driving was traveling over 100 miles per hour, unsafely passing other vehicles, passing other cars using the right shoulder, and almost striking a bicyclist on the right shoulder. The vehicle eventually passed the trooper on the interstate, and a radar speed measuring device captured the car's speed at 131 miles per hour. A traffic stop was conducted, during which the defendant identified himself with a Hungarian driver's license and passport in the name of "Nagy Mihaly" and date of birth of in September of 1985. As the trooper attempted to place the defendant under arrest, the defendant pulled away from the trooper to prevent the trooper from placing him in handcuffs. Defendant forcibly resisted the lone arresting officer's attempt to handcuff him. Fortunately, a passing motorist stopped and helped the struggling officer to obtain control of the defendant. PSR, ¶ 62; GVO, Ex. I.

### III. The PSR

The government agrees with the USSG calculation of Probation. Defendant's offense level for Counts 1-7, which all group with one another, is 25. PSR, ¶¶ 36-46; 48-54. Second, that defendant's guideline sentence for Counts 8-10 is two years' imprisonment for each count. PSR, ¶ 47. Third, defendant has one criminal history point and his criminal history category is I. Fourth, based upon the foregoing, defendant's USSG range of imprisonment for Counts 1-7 is 57-71 months' imprisonment. PSR, ¶ 103. Additionally, a sentence of 24 months' imprisonment must

be imposed for Counts 8-10, and those must be imposed consecutive to that for any other counts. PSR, ¶ 102.

When imposing a sentence of imprisonment for Counts 8-10, Title 18, United States Code, Section 1028A(b)(3) provides that "in determining any term of imprisonment to be imposed for the felony during which the means of identification was transferred, possessed, or used, a court shall not in any way reduce the term to be imposed for such crime so as to compensate for, or otherwise take into account, any separate term of imprisonment imposed or to be imposed for a violation of this section."

The government has no factual objections to the PSR.

## IV. Imposition of sentence

### A. Custody

The government requests that the Court impose a sentence of 81 months' imprisonment. More specifically, the Court should impose concurrent sentences of 57 months' imprisonment on each of Counts 1-7. In addition, the Court should impose three 24-month sentences of imprisonment for Counts 8-10, concurrent to one another, but consecutive to the 57-month terms for Counts 1-7, resulting in a total combined sentence of 81 months' imprisonment.

First, defendant repeatedly engaged in criminal conduct that imposes an enormous toll on the U.S. economy. According to the FBI, card skimming is estimated to cost financial institutions and consumers more than $1 billion each year.[4] This

---

[4] https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-scams-and-crimes/skimming.

does not include the emotional toll and inconvenience suffered by the individual account holders whose financial accounts were compromised to commit these crimes. Defendant's high-tech thievery of the individuals' personal financial information and assumption of their identity to enrich himself is precisely the sort of conduct that led Congress to enact the substantial penalty that 18 U.S.C. § 1028A demands be imposed for such offenses.[5] A significant term of imprisonment is necessary to adequately recognize the seriousness of the crime.

Second, defendant's criminal conduct was not fleeting, nor did it stem from a momentary lapse in judgment. Defendant schemed with his co-defendants over the course of more than 8 months while engaging in these sophisticated offenses in Illinois and New Jersey, installing skimming devices on numerous ATMs. In addition to falsely representing his identity to banks in this case, defendant has previously identified himself fraudulently through the use of a counterfeit passport. *Supra*, 11. Defendant's conduct reveals him to be a repeated and enthusiastic participant in this form of criminality, suggesting a greater need for specific deterrence than a typical defendant in a more simple fraud case.[6] *See United States v. Anderson*, 72 F.3d 563, 566 (7th Cir. 1995) (evidence that defendant "through aptitude or experience has

---

[5] *See* H. Rept. 108-528, Purpose and Summary ("H.R. 1731, the "Identity Theft Penalty Enhancement Act," addresses the growing problem of identity theft. Currently under 18 U.S.C. § 1028 many identity thieves receive short terms of imprisonment or probation; after their release, many of these thieves will go on to use false identities to commit much more serious crimes."). Viewed at https://www.congress.gov/congressional-report/108th-congress/house-report/528/1?outputFormat=pdf.

[6] For example, a bank teller stealing funds from the till or a postal employee stealing checks from the mail to overcome temporary financial difficulties.

become skilled in the commission of a particular type or class of crimes … would be clear ground for a heavier sentence.").

Third, in addition to his refusal to accept responsibility, defendant's decision to avoid punishment through commission of additional criminal conduct – his perjurious testimony at trial – demonstrates a particularly high need for specific deterrence. Despite the overwhelming evidence of his guilt, defendant made a mockery of the judicial process by providing testimony to the jury that was shamelessly laced with obvious lies.

Defendant's disrespect for the law also manifested itself in the manner that he – on two occasions – forcibly resisted law enforcement agents attempting to arrest him. The officer who attempted to arrest defendant for driving recklessly[7] in Arizona in 2019 had to be assisted by a passing motorist to gain control of him. *Supra*, p. 11. Even when caught red-handed by the Westfield PD at the ATM at which he had installed a skimmer, defendant forcibly resisted the arresting officers who struggled to gain his compliance. *Supra*, p. 5. To promote respect for the law, to protect the public from defendant, and to adequately deter someone so committed to criminal conduct, a significant sentence must be imposed.

In addition to adequately punishing the defendant, a significant sentence is necessary to address the need for general deterrence. As previously described above, card skimming is widespread problem plaguing financial institutions and consumers. A recent surge in such cases connected to the community from which defendant hales

---

[7] Defendant admitted during his trial testimony that he was driving at approximately 130 mph prior to his arrest.

14

demonstrates that concerns for general deterrence also weigh heavily in favor of a significant sentence.[8] The sentence imposed by this Court should signal to others that such conduct will be met with swift and serious punishment in this district.

To adequately further the goals of section 3553, the Court should impose a low-end sentence of 81 months' imprisonment.

### B. Financial

The Court should impose a restitution judgment in the amount of $177,280, as indicated in the PSR (¶ 125) and in Exhibit F to this sentencing memorandum. The government does not recommend imposition of a fine.

### C. Terms of supervision

The government recommends that defendant be placed on supervised release for 3 years in the event that he is not removed from the United States prior to his

---

[8] *See, e.g.*, https://www.cbsnews.com/texas/news/dallas-credit-card-skimmer-fraud-operation-arrest-romanian-men-charged/ (3 Romanian men facing charges after credit card skimmers, fake IDs, and payment cards recovered in Dallas home), dated July 22, 2025; https://www.secretservice.gov/newsroom/releases/2025/05/romanian-crew-convicted-atm-skimming-case (man and woman who illegally resided in Houston admitted their roles in installing and removing ATM skimmers from multiple banks) dated May 16, 2025; https://www.justice.gov/usao-edla/pr/romanian-men-indicted-card-skimming (Romanian men indicted for card skimming in the eastern District of Louisiana) dated March 25, 2025; https://www.kwtx.com/2025/02/14/romanian-national-gets-life-prison-credit-card-skimming-smith-county-texas/ (member of Texas Financial Crimes Intelligence Center testified at sentencing hearing regarding the increasing role Romanian organized crime plays in card skimming schemes); https://www.fbi.gov/contact-us/field-offices/losangeles/news/romanian-police-serve-dozens-of-warrants-following-parallel-investigation-with-the-fbis-los-angeles-field-office (dozens of warrants executed in Romania in parallel investigation with FBI into transnational organization whose members conduct ATM skimming operations in the United States) dated February 14, 2025; https://www.justice.gov/usao-edmo/pr/six-accused-bank-fraud-involving-atm-skimming-devices (numerous Romanian defendants charged with card skimming at bank ATMs in the St. Louis area) dated November 26, 2024; https://www.justice.gov/usao-edca/pr/romanian-national-sentenced-using-debit-card-skimming-devices-atms-steal-nearly-150000 ("Romanian national sentenced for using debit card skimming devices on ATMs") dated July 26, 2024.

release. The government concurs in the terms recommended by probation in the PSR, which appear necessary to monitor the defendant's compliance with the Court's orders, to enhance probation officer and defendant safety, to reduce the likelihood of recidivism, to promote responsible fiscal behavior and compliance with any financial penalty imposed by the Court, and to protect the public.

**V.     Conclusion**

For the reasons set forth above, the government respectfully requests that the Court impose an 81-month sentence of imprisonment and a term of supervised release of three years.

Respectfully Submitted,

ANDREW S. BOUTROS
United States Attorney

By:     /s/ *Brian Hayes*
Brian Hayes
Assistant United States Attorney
219 S. Dearborn, 5th Floor
Chicago, Illinois 60604
Brian.Hayes@usdoj.gov

Dated: July 23, 2025

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF), the attached document was served pursuant to the district court's ECF system as to ECF filers.

By: /s/ *Brian Hayes*
BRIAN HAYES
Assistant United States Attorney
United States Attorney's Office
219 South Dearborn, 5th Floor
Chicago, Illinois 60604
(312) 886-2447